Good morning. May it please the Court, my name is Susan E. Hill and I represent the petitioner, Mr. Paul Ojekwe. There is no evidence here that contradicts Mr. Ojekwe's testimony. His testimony was deemed credible by both the immigration judge and the Board of Immigration Appeals in an alternative holding. From there, his evidence included, first of all, an authenticated by the Nigerian consulate arrest warrant that personally identified Mr. Ojekwe and targeted him for arrest. Second, he had letters that his family had written him. They were unsolicited. They did not even know that he was applying for any kind of protection in the United States. And they described the political land dispute and events that were happening in Nigeria, which caused them to flee the village, flee the country to its bordering neighbors. And part of his family even fled to London. It also explained how other people who were mentioned in the arrest warrant had either been killed by the national police, or they had fled for their lives, or they had been disappeared, or not been disappeared, but they had disappeared and no one knew their whereabouts. Further corroborating his testimony were country condition reports that ---- Kagan. Well, if we assume for the moment that he was credible and just deal with the alternative ruling, is that what you're doing now, essentially, Jim?  Well, dealing with the alternative ruling, it appears that he may well have been in danger from someone for his involvement either in reporting someone to the FBI or in this whole land dispute in Nigeria and so on. But why is that either protected ground or sufficient to meet a compensation against torture? With regards to withholding, Your Honor, it's a protected ground on account of political ideology. In his declarations and in numerous voluminous documentation about the background dispute, it was a political land dispute. He belonged to the Osule Welfare League, or the acronym for that was OWL. And OWL has been described as a union that represents the town's interests. And that union, he belonged to a political party, the Concerned Citizens Political Party. The opposition party, which was the majority ruling party, both in his local area as well as nationally in Nigeria, was the PDP. And this dispute had become very much political. There were many political figures involved in it, including Mr. Umenyora, who was the traditional leader, as he was described in the background documentation. Was he the person that your client was supposedly talking to the FBI about? No, that was Mr. Uzuwuru. Okay. There's a lot of people in this case that have similar names. Mr. Umenyora was accused of inciting the violence, getting the youths to start rioting. And those youths actually targeted people who were specifically named or involved in this land dispute. There were newspaper articles that indicated that. And this violence – Is the land dispute ongoing or has it ended? Excuse me. And also relatedly, wasn't the government trying to stop the violence around the land dispute? There were reports of the state governor sending in national police in an attempt to quell. But then, according to the newspaper articles – excuse me, my throat's – I'm recovering from – Help yourself. I think we all are. According to newspaper articles, there were reports that the police had orders to shoot on sight. Additionally, an inquiry committee had been set up after the violence. But even that committee was embroiled in further dispute with factions claiming that people running the inquiry had political interests. And, of course, those people having counterclaims against those who were claiming that it was not an unpartisan inquiry. So, yes, the dispute is still – or at least at the time that we have evidence of it – was still ongoing at the time of the last hearing that Mr. Ojekwe had in front of the immigration judge. So this arrest warrant was issued in June – well, not – Claire, it's got sort of two dates on it. December 27, 2002 and June 21, 2005. Why wasn't that mentioned in the original asylum application? There – Mr. Ojekwe's not specifically asked why it was not mentioned. However, he did reference that he was – that he did have a political claim. And he stated he was a member of a minority party who spoke out against the majority party in his supplemental declarations and later in other corroborating evidence. There's indication that, yes, the OWL, the executive's committee that he was on, was charged with overseeing certain benefits for the community, such as schools and building hospitals and so on. But what he actually said originally, the emphasis on the original application, was on Mr. Uzuru and his group of criminal friends. And then he says, I also believe that members of the leading political party would harm me because they will not like my political views, which I will voice, which doesn't suggest that there was any past involvement. It does not specifically state past involvement. However, at the time when he filed his application, his attorney did state that she wanted opportunity to supplement that application, and the judge agreed to it. There was no issue. His declaration, or supplemental declaration, was prepared only four weeks, or filed four weeks later, prior to any testimony ever being taken on his application. He had never yet, as you might say, committed himself to the information in the application as far as testifying to it and verifying that there was no further supplementation that needed to be stated. Moreover, the additional supplementation that was filed just four weeks later was indeed all of the court documents, including the arrest warrant, that had been issued in 2005. But again, the declaration that he filed, was that filed with the application? Or that was a later one? There was a supplemental declaration, Your Honor. But the one that's called Declaration of Paul Ogigwe, that was with the application? That's on page 666, Your Honor.  That was filed at a separate hearing. All right. Well, that one also was basically focused on Mr. I can't say his name, but Ogigwe? Ogigwe. Ogigwe? Yes. And not really. I mean, his main claim of other political connections was that he was on some committee and that he wrote some article that he sent to him that was never published. And that's about it in terms of anything that's claimed to be political. I mean, you're now going through a longer story trying to say that this whole land dispute was in some sense political. But his problem was with Mr. Ozururo and the fact that Mr. Ozururo was a co-defendant and was going to get him. Yes, Your Honor. And he did focus on that initially in the initial declaration. He did raise other elements. And then in supplementation, his declaration that you just referenced was filed in conjunction with the numerous authenticated or eventually authenticated documents from Nigeria. Which shows that he had, if you believe him, that he had a warrant, which isn't inconsistent with any of that and doesn't demonstrate any political connection or any likelihood of torture. And that his family was worried about him, again, which they may well have had a reason to be, but it doesn't have any political connection. Political connection, I believe, Your Honor, has been established later on with further corroborating documentation. He was detained at the time when all of this took place. And he was represented by a pro bono counsel. So his ‑‑ and he had frequent testimony about the limitation of his resources and ability to gather evidence. And, again, the judge did not elicit specific testimony from him about the filing of this declaration and any questions such as what the Court is bringing up as well. I see I have one minute left. If there is ‑‑ Can I just ask a different question? If we were to get into the credibility issues, when ‑‑ what was the sequence in terms of the administrative law, the IJ's claim that ‑‑ or determination that there wasn't adequate corroboration, was there any opportunity given to come up with a corroboration? Or was that all at the end of the case, at the end? It was mostly at the end, Your Honor. At times the judge asked, for instance, why do you not have this document or that document? But the judge never made the specific statement as required in Wren v. Holder that your testimony is insufficient, therefore, I am requiring corroboration and giving him an opportunity either to obtain it or to elicit an explanation. And none of that ever happened. Excuse me? So if Wren is the governing precedent, there wasn't an opportunity, information given as to what corroboration was required and an opportunity to obtain it. Correct. There was never any indication that the corroboration was required and it must be produced and nor was there an explanation that Mr. Ojekwe must provide an explanation definitively of why it was not available. I'll give you a minute, Emery Bove. I have one related question to that. Was it clear to the IJ that when Mr. Ojekwe intended to submit supplemental documents that he would be making additional claims? And I ask that because much of the adverse credibility determination turns on supposed differences and contradictions or inconsistencies between the first and the second. Is your position that they're really all part of the same claim? Yes, Your Honor. The position is that it is the same claim. Was it clear to the IJ? It's unclear because the transcript itself says indiscernible. So we don't know exactly what the attorney told him. All right. Thank you. Counsel. Good morning, Your Honors. May it please the Court, I'm Carmel Morgan on behalf of the respondent, the U.S. Attorney General. Substantial evidence supports the agency's determination that the petitioner failed to meet his burden of showing that he more likely than not would face persecution or torture in Nigeria. The burden is on the alien to establish his eligibility for relief and protection. Credible testimony alone is not automatically sufficient to meet that burden of proof. Is this a Real ID Act case? It is a Real ID Act case, Your Honor. So in that case, even if the petitioner is found credible, it's possible for the immigration judge to still require corroboration. In this case, as you know, the immigration judge found the petitioner was not credible, but he made an alternative and dispositive holding that he didn't meet his burden of proof. But isn't he required to tell the petitioner that he needs additional corroboration, give him notice of that? The government's position is that. I understand it's the government's position, but we obviously have been going around about that in this circuit for some time, including an on-bank case, which then went off on a different ground. And in relation to that, by the way, I wonder whether, as I recall, and I haven't looked back at this, the statute that the government tends to rely on for this is actually the asylum statute, which doesn't apply here. If you remember the on-bank cases name, I'm now. Yes. Pointed out that that provision only applies to asylum cases. So I'm not even sure what provision applies here, but whatever it is, it is we now have two somewhat at odds opinions and pending on-bank petitions. So you're not. Your position is interesting, but it's right now we're kind of in a mess about it. Right. The notice and opportunity to explain rule, I understand, is sort of in flux in this circuit. I think that in this case, regardless of whether that rule exists or not, and what the rule looks like, the government would say that in this case the record is clear that Mr. Ojekwe was given multiple opportunities to explain what documents he didn't have and why so that he, in fact, was given notice. But that's not really all of it. To me, it would be more productive to argue on the assumption that he's credible right now because, honestly, if you're going to rely on the credibility finding, we're going to have to suspend the case. I mean, that's just what we're going to have to do because we have pending on-bank petitions. Okay. So let's go on the assumption for now because it's the only way we could decide the case now that he was credible. And assuming that he's credible, you still have the burden of showing specific and detailed and persuasive evidence, and Petitioner didn't do that in this case. Even assuming his credibility, the evidence that he came forward with just wasn't enough to meet that very high burden of showing that he more likely than not would face persecution or torture. What evidence is there, if any, as to why the warrant was issued naming him? Pardon me? Why the warrant was issued naming him. What evidence is there as to the reason for that? The warrant itself states that it's in connection with a land dispute. There are multiple articles that were submitted, newspaper articles and such, confirming that this town where he says that he served on this committee has been embroiled in a land dispute probably since the 1970s. He says the land dispute was itself political. It was a dispute about whether, as I understand it, whether the town was going to have the land or whether individuals were going to have the land. I'm not sure how that's political. I don't think he meant his burden of showing that it was a political nexus with regard to the land dispute. He does claim to have been involved in the CCP political party, but it's unclear what that political party had to do with his appointment as the executive. He also claims to have been on the, quote, executive committee. Correct. Of what? Of the town? Of the town, I believe. Isn't that political? It's a political position. But the allegations here I think are basically allegations of corruption, and I don't think that corruption is necessarily a political opinion. It also looked to me after reviewing a lot of the documents that perhaps some people who had served on the executive committee together turned against one another so that people perhaps within the same party didn't reach the same agreement as to this piece of land. He also says, with regard, I guess, to the cat claim, that if your name is on an arrest list, you're not going to get arrested if you go back or you're going to get killed. Yes, that's correct, Your Honor. We know that at least one person who was tied to this land dispute, that village chief Meniora, was arrested and detained. He gave an interview. He didn't allege that he was tortured during his detention period. He wasn't specifically named in that arrest warrant, but we have documentation that someone was arrested and detained and apparently unharmed. I think that the petitioner had brought up the fact that the police were sent into the village, and it seems like the government was doing their best to help resolve the land dispute. They set up this judicial inquiry commission. They sent in the police to help protect the community. And, unfortunately, I don't think that the brother's letter that speaks about the police says what petitioner says it says. If you look at the letter, I think it's on page 660 of the record. So, brother, don't come home. They will kill you. You see, Oki was killed before the police saw his dead body, who is among the wanted persons. We are fine. Yeah, that's the quote. He was killed before the police saw his dead body. My reading of that is that it couldn't have been the police that killed him because, grammatically, he was already killed before the police saw his dead body. We don't know who it is that killed him. Who's going to kill him? Who does he testify is going to kill him, the police or people that police are unable to control? He says both, I believe, at different times. And, in fact, he expresses some frustration at one point that he's not sure who's going to kill him. He's just afraid that it could be the police if he's arrested. It could be angry people in the town, or it could be some unknown persons. And his sister was, in fact, killed. Yes, it appears that his sister was, in fact, killed. The circumstances surrounding that are a tiny bit unclear. He testifies or, rather, submits a declaration that he learned of her death through a friend and that the friend told him that his sister was killed during some mob violence in that village. Well, what he says is that they killed his sister, hoping that he would come home for the funeral so that they could kill him. Yes, he does say that. He doesn't say that his friend told him that. It's unclear how. I think that's just speculation on his part. If it's mob violence, then it's unclear whether the mob was also killing other people whose relatives would be expected to come back for their funerals. I think that's highly unlikely. The dates also don't match up, Your Honor. In his declaration, he said that he learned that his sister had returned to the hometown in March of 2007, I believe it was. The date of her death in the obituary in the newspaper says April 18th of 2007. That's more than a month after the documented records speak of the mob violence. And all of the newspaper articles I saw said that the mob violence occurred on March 1st and 2nd. If she had come back to see if their home was burned, which makes sense, if she had returned in March, why was she killed on April 18th? There's none of the newspapers speaking about any further violence on April 18th. The letters, there are two letters. Are they both supposedly from the same brother? There's actually three letters from the brother and one from the mother, and they're all from the same brother. I've written a series of letters to you, but no reply. How is life? Something like that. And this is the one that says, so brother, don't come home. And that's supposed to be from the same person who signed the younger brother? Yes. Correct, Your Honor. I think they're all from the same brother. Did anybody ever do any forensic? It doesn't look to me like the same handwriting, but did anybody ever look at that? I don't believe that there was any forensics done on the letters. Okay. Opposing counsel did agree at one point that the letter submitted about the sister's death did have two different inks on it. It looked like some of the writing had been written over. There were some unusual things about the letters from the brothers. One of the things that the immigration judge had pointed out was that there was a letter that was dated April of 2005, but it referenced occurrences from March of 2006. That's an impossibility. And when the Petitioner was asked about it, he said, well, my brother just must have been mistaken. So Petitioner characterizes it as a typo, but it's handwritten. I'm not sure that's quite the same as a typo. The warrant seems to have a date of December 2002 and talk about June of 2005. That's correct. There are two different dates on the arrest warrant. It was authenticated by the embassy, and the government didn't challenge the authentication, but I still think that goes to the weight of the evidence itself. There was a lawyer from Nigeria who apparently felt that whoever had drafted the document used an old piece of letterhead, but he doesn't say where he got that information, and I'm not sure that that's very persuasive evidence of the two different dates. Didn't the I.J. assume that the warrant arose out of the court prosecution? Yes. And isn't that impossible? Wasn't the orders that the I.J. relied on issued after the date of the arrest warrant? I believe that the court orders that were referenced were all from 2005. I'm not sure what the exact dates were. The arrest warrant, if you look at the later date, which he urges us to do as the correct date, was in December of 2005. I don't think it's impossible that it would have arisen out of the same proceedings. Granted, Petitioner was not named in the lawsuit himself, but he alleges that as a former executive they were interested, I guess, in having him give further information related to the land dispute. But if the warrant didn't arise out of the litigation, failure to obey orders in the litigation, then don't we have a situation where all the people named in the arrest warrant were killed? Well, he alleges that all of the people named in the arrest warrant were either killed, left the country, or were missing. The record doesn't really support that contention. If you look at the record beginning at around page 500, he's asked about the different people that are listed in the warrant. And in many cases he just says, I don't know. He hasn't been in Nigeria since 2002. I don't think that that means that they've been disappeared or are missing. He just simply doesn't know where they are. As to the one person that he claims was killed relating to the land dispute, this Mr. Oki, again, that quote from the brother's letter doesn't indicate that it was the police that killed him. We don't know who killed him or why. And additionally, he submitted a photograph of somebody that was kind of blurry and the person was face down and alleged that that gentleman was, in fact, Mr. Oki. And he knew that through his brother. In his initial asylum application, he said that his brother and the rest of the family had left their home state in 2003 or 2004 due to the threats that Mr. Uzuru had made against his family. But his brother couldn't have known about Mr. Oki's death and couldn't have been approached by people with the arrest warrant if he had left in 2003 or 2004. So that's definitely an inconsistency in the petitioner's presentation of evidence. I've... You're over your time quite a bit. I see that. So thank you. To me, just in general, and I guess I'd like a comment on this in terms of how we proceed, that your arguments with regard to the assumption of credibility keep going back to a lack of credibility. In other words, it doesn't sound to me that... It sounds to me you have a lot more confidence in your lack of credibility argument than in your argument that if it were credible, there would not be a ground because you keep reverting that. Right. Your substance depends on disbelief. Right. I see where you're coming from. I definitely do. We definitely stand behind the credibility determination as well. I think what they have in common is this lack of corroboration, and that goes to both credibility and the sufficiency of his evidence in meeting that very high burden of more likely than not or greater than 50 percent. And so it's really the corroboration element between the two that is the commonality, not really the credibility, I think, Your Honor. All right. Thank you, counsel. Thank you. Thank you. As you noted, Judge Berzon, that the government does keep going back to the credibility and sufficiency of the evidence. However, what we have in front of us is a holding by the lower courts that this evidence, even if all of it is to be believed, still does not support the finding. Therefore, we must take all that evidence without nitpicking at any alleged difficulties or inconsistencies or whatever that the government has identified. And also, for the more going back to your question earlier about the political nature of this dispute, I was reading again just now page 666 of his declaration. I believe it does contain numerous references to the political nature of what was happening in Nigeria. Mr. Ojekwe, again, was limited in the source of his information, but it has been corroborated by authenticated documentation and newspaper articles. My understanding of the very last thing that the government lawyer said is that there would – it was more likely than not, both as to the withholding and as to the CAF claim, to be persecuted or tortured, and that the corroboration comes in at that separate stage, not so much to prove his credibility as to prove how likely it is that he's going to be tortured. Now, why doesn't that make sense? I'm sorry. What does not make sense? Why doesn't it make sense to say that quite aside from corroborating his account, that corroboration is relevant sort of at the burden of proof stage as to how likely it is that he would be tortured? In other words, he might be perfectly – everything he said might be true and he might believe all of it, but in order to know – to calculate the risk of his actually being persecuted or tortured, having corroboration is relevant. Why isn't that, at least as a general idea, make sense? There is corroboration here. There's, again, the accounts of the violence that took place in the community. The violence was targeted towards figures that were involved in the land dispute. Mr. Ojekwa's family had fled the country and then later learned of the violence happening there related to the dispute and warned him not to return. And the one family member who did return was killed. When did he last return? He last, I believe, was in Nigeria in 2002, I believe is what his testimony was. And he was scheduled to return in 2004, but I think that is when he self-surrendered to the FBI here in the U.S. All right, thank you. Thank you very much, counsel. Ojekwa v. Holder is submitted.
judges: Whyte, Wardlaw, Berzon